1
2
3
4
5
6
7
8

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

9   ALEXANDER K. LOUIS,                    CASE NO. 1:10-cv-00656-SMS

10                        Plaintiff,

11        v.                              ORDER REVERSING AGENCY
                                          DETERMINATION AND REMANDING
                                          FOR PAYMENT OF BENEFITS
12   MICHAEL ASTRUE,
     Commissioner of Social Security,

13
                         Defendant.
14   _____/

15

16        Plaintiff Alexander K. Louis, proceeding *in forma pauperis*, by his attorneys, Sackett and

Associates, seeks judicial review of a final decision of the Commissioner of Social Security

("Commissioner") denying his application for supplemental security income  ("SSI") pursuant to

Title XVI, of the Social Security Act (42 U.S.C. § 301 *et seq.*) (the "Act").  The matter is

currently before the Court on the parties' cross-briefs, which were submitted, without oral

argument, to the Honorable Sandra M. Snyder, United States Magistrate Judge.  Following a

review of the complete record and applicable law, this Court concludes that the Commissioner

erred in determining that Plaintiff did not qualify for disability benefits, reverses the decision

below, and remands this case for payment of benefits.

24   I.    **Administrative Record**

25        A.    **Procedural History**

26        On May 23, 2007, Plaintiff filed a SSI application.  His claims were initially denied on

September 12, 2007, and upon reconsideration, on November 20, 2007.  On January 18, 2008,

17
18
19
20
21
22
23
27
28

Plaintiff filed a timely request for a hearing.  After Plaintiff failed to appear at the hearing on September 18, 2008, his attorney waived his presence and the hearing proceeded.  On March 4, 2009, Administrative Law Judge William C. Thompson, Jr., denied Plaintiff's application.   The Appeals Council denied review on January 27, 2010.  On March 30, 2010, Plaintiff filed a complaint seeking this Court's review.

### B.   Factual Record

Plaintiff (born March 16, 1964) became disabled on September 1, 1990.  He received SSI from June 30, 1997, until March 2005, when he was convicted of "petty theft with a prior" and incarcerated following his attempt to leave a grocery store without paying for the groceries in his cart.

Plaintiff was severely injured when he was beaten by sheriff's deputies in 1989, incurring a head injury that required several weeks of hospitalization.  Plaintiff told consulting psychologist David Richwerger, Ed.D., that he was beaten because the deputies thought he was going to kill himself.  Following the beating, Plaintiff attempted suicide.  Thereafter, he spent an unspecified amount of time at Highland Hospital in Oakland.  According to his mother, "he has never been the same."  AR 118.

Plaintiff has experienced several other head injuries, notable a major head injury in an automobile accident while a child.  He has a history of seizures.  Plaintiff and his family attribute his mental illness to the 1989 beating.

Plaintiff contended that he was unable to work because of his 1989 head injury and mental illness, explaining, "I can't concentrate.  I don't want to get out of bed.  I have back pain." AR 87.  His medications included Cogentin,[1] Risperdal,[2] and Wellbutrin.[3]

///

---

[1] Cogentin (benzotropine mesylate oral) is prescribed to treat tremors caused by Parkinson's disease and by other medical conditions and medications.  www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000595 (August 5, 2011).

[2] Risperdal (risperidone), an atypical antipsychotic, is used in adults to treat symptoms of schizophrenia and bipolar disorder.  www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000944 (August 5, 2011).

[3] Wellbutrin (bupropion) is an antidepressant.  www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000970 (August 5, 2011).

1    Plaintiff attended school through the eleventh grade.  Although Plaintiff told the agency

2  that he had never worked, his mother reported that he did body and fender work and painted cars

3  before he was injured in 1989.  Before his death, Plaintiff's father owned a body shop and did

4  auto restorations.  Plaintiff told his psychiatrist at Atascadero State Prison that he had done car

5  painting and restoration and had also worked as a warehouseman for a soap company.

6     Plaintiff had a history of ten to twelve arrests; most occurred after he was beaten in 1989.

7  Plaintiff was incarcerated at California Men's Colony beginning on September 1, 1995, and

8  again following his 2005 conviction.  Plaintiff told Richwerger that he had been imprisoned a

9  total of 22 to 25 years.

10    Beginning May 7, 2007, Plaintiff lived with his mother and a sister in Sonora, California.

11  His family ensured that he remembered to take his medications and ate on schedule, helped him

12  dress, and monitored his personal hygiene.  In a third-party report to the agency, Plaintiff's

13  mother reported that the entire family (Plaintiff has seven brothers and sisters) shared in

14  Plaintiff's care and supervision.

15    Plaintiff was able to prepare soup and a sandwich with help.  His household chores

16  included emptying the garbage, helping fold laundry, making beds, and watering and raking the

17  lawn.  He was able to care for the family's cats and birds with help.  He needed reminders to

18  finish his chores.

19    Plaintiff was unable to handle money.  He could not calculate change or recognize if he

20  were overcharged.  Plaintiff has been unable to drive since 1990 or 1991, when his mental illness

21  resulted his losing the ability to do so.

22    Plaintiff left the family home to see the doctor, his parole officer, to go to the pharmacy,

23  and to shop.   His family did not let him go out alone; Plaintiff's sister generally accompanied

24  him.  He was easily confused.  Plaintiff did not like to go out alone since he often could not find

25  his way home and got lost by getting on the wrong bus.  His mother opined that, since Plaintiff

26  has been ill, "he has lost a great deal of his I.Q."  AR 109.

27  ///

28  ///

1    Plaintiff's anger control was improved only as long as he took his medication on

2    schedule.  He was unable to handle stress or change, which made him annoyed.  Continued

3    anxiety and stress ultimately exacerbated his symptoms, particularly hearing voices.

4         Plaintiff's sister accompanied him to his initial interview at the agency.  The interviewer

5    noted that Plaintiff evinced difficulties in understanding, coherency, concentrating and

6    answering.  He had a "groggy or glazed look on face" and needed to ask his sister for assistance

7    in responding to questions other than his address and the facilities at which he had been

8    incarcerated.

9         Following his father's death on May 17, 2007, Plaintiff experienced increased anxiety,

10   stress, and trouble sleeping.  He heard voices more frequently and verbally responded to them.

11        **Atascadero State Hospital.**  On June 28, 2006, Plaintiff was transferred from California

12   Men's Colony to Atascadero State Hospital pursuant to California Penal Code § 2684(a)

13   (Transfer to state hospital; mentally ill, mentally deficient, or insane prisoner), after Plaintiff

14   requested help, telling prison authorities that he was having problems and wanted to hurt himself.

15   On admission, Plaintiff related a variety of symptoms, including frustration, anger, and poor

16   impulse control.  Psychiatrist Hadley Osran, Sr., M.D., prepared the admission assessment.

17        Plaintiff was easily angered.  He complained of periodic depression, with each episode

18   lasting from two weeks to one month, and vegetative symptoms including weight fluctuation,

19   low energy, low concentration, and periodic suicidal ideation.  He also had periods of greater

20   energy for a week or so at a time, but was able to sleep normal amounts during those periods.

21        Plaintiff reported being hospitalized by Tuolomne County Mental Health pursuant to

22   California Welfare and Institutions Code § 5150 on six or seven occasions.  He had also been

23   hospitalized in South Carolina.  Plaintiff had at least one previous suicide attempt.

24        Plaintiff admitted trying marijuana, cocaine, and methamphetamine.  He drank wine.

25   Although he denied any substance abuse problems, he had previously completed a twelve-step

26   program while on parole.  Later in the intake interview, Plaintiff admitted that he drank a lot.

27   ///

28   ///

Osran summarized Plaintiff's mental status:

> The patient was alert and oriented to person, place and time. His mood seemed, at best, mildly depressed, most likely euthymic. His speech was coherent and mood directed without evidence of looseness of association, disorganization or confusion. His speech was normal rate and volume. He comprehended the questions posed to him and answered in a logical manner. He denied any paranoia, suicidal ideation or homicidal ideation. He reported occasional auditory and visual hallucinations last occurring one week ago.

He scored a 29 out of 30 on his Folstein Mini Mental Status Examination.

AR 144.

Osran's diagnosis was:

| | | |
|---|---|---|
| Axis I | 293.83 | Mood disorder due to history of head injury |
| | 293.82 | Psychotic Disorder due to head injury |
| Axis II | 301.7 | Antisocial Personality Disorder |
| Axis III | | Status Post Head Injury |
| Axis IV | | Incarceration |
| Axis V | 50 | Current GAF |
| | | Last Quarter GAF |

AR 144.[4]

On July 31, 2006, Plaintiff reported that "he was doing well and stated that he barely heard voices." AR 140. He denied suicidal ideation. He was, however, sleeping three-quarters of the day and still felt tired.

On September 13, 2006, Plaintiff complained he was depressed and was hearing voices telling him to do things.

On October 18, 2006, Plaintiff reported that he had a good mood and no suicidal ideation, and that the "voices were quite a bit better." AR 140. On October 19, Plaintiff told Osran that

---

[4]   The Global Assessment of Functioning (GAF) scale may be used to report an individual's overall functioning on Axis V of the diagnosis. American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders at 32 (4th ed., Text Revision 2000) ("DSM IV TR"). It considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness," excluding "impairment in functioning due to physical (or environmental) limitations." *Id*. at 34. The first description in the range indicates symptom severity; the second, level of functioning. *Id*. at 32. In the case of discordant symptom and functioning scores, the final GAF rating always reflects the worse of the ratings. *Id*. at 33.
    GAF 50 is at the top of the range GAF 41-50, which indicates "Some impairment in reality testing or communication (e.g., speech is sometimes illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school)." *Id*. at 34.

he was still hearing voices "a little bit." AR 140. Because Plaintiff was stable on his medications, had no serious symptoms, and was not involved in treatment but laid in bed most of the day, Osran recommended that Plaintiff could be returned to prison.

On November 21, 2006, Plaintiff reported visual hallucinations, in which he saw a man smoking a cigarette. As a result, his Risperdal dosage was increased. On December 6, 2006, Plaintiff was still in Atascadero.

**Parole Outpatient Clinic.** Plaintiff reported for parole on March 29, 2007. Social worker June Henry noted Plaintiff's inconsistent compliance with medication. Henry noted that Plaintiff was mildly irritable and mildly paranoid, but not suicidal. His attention, concentration, insight and judgment were below normal limits. Plaintiff was trying to contact his sister but had not been successful.

Plaintiff missed his parole appointment on April 24, 2007.

On May 17, 2007, psychologist G. Zimmerman, Ph.D., performed an initial mental health evaluation for the Parole Outpatient Clinic to which Plaintiff was referred after his parole from prison. Plaintiff told Zimmerman that he was hearing voices and seeing things. Zimmerman assessed Plaintiff's mental status:

> [Plaintiff] arrived for the interview session on time and was dressed in clean and appropriate clothing. He seemed to sit, stand, and move with no obvious difficulty. He was generally open, accessible and cooperative and appeared to be a generally reliable informant. At the time of the current evaluation, he was alert, with interest gained and held. His attention span was adequate for all tasks. Manner of speaking was within normal limits with no blocking, hesitation or other signs of cognitive editing. There was no loosening of association, concreteness of thought or other signs of thought disorder noted in his responses. Information was presented in a generally logical manner, with no obvious withholding or restriction due to hostile, fearful or defensive reaction. Mood was within normal limits and affective reaction was appropriate to ideation. [Plaintiff] was well oriented to person, place, and time, and appeared to have no serious difficulty recalling recent or remote events. Current reality contact was unimpaired.
>
> Currently, depressive signs were reported as mixed, with no reported disturbance of sleep patterns, somewhat limited appetite, and significantly lowered energy level, possibly due to Hepatitis C. [Plaintiff] denies any history of suicidal gestures or attempts within the last ten years. He gave a history of auditory and visual hallucinations, voices of a generally paranoid nature and "angels." There was no overtly delusional material reflected in his remarks. There is no indication

///

of paranoid ideation. [Plaintiff] appears to be mentally competent and responsible for his actions at this time.

AR 154.

Zimmerman diagnosed Plaintiff:

| | | |
|---|---|---|
| Axis I | 298.90 | Psychotic Disorder, Not Otherwise Specified |
| | 296.990 | Mood Disorder, Not Otherwise Specified |
| | 305.70 | Amphetamine Abuse |
| | V71.01 | Adult Antisocial Behavior |
| Axis II | V71.09 | No Diagnosis |
| Axis III | | Medical Concerns: History of Head Injury, leg and shoulder pain |
| Axis IV | | Psychosocial stressors: Release for Custody, Unemployment |
| Axis V | | GAF=85 |

AR 154.[5]

Psychiatrist Jaime Ortiz, M.D., treated Plaintiff in "telemedicine sessions" on June 5 and July 31, 2007. On both occasions, Plaintiff was stable on his medications.

**Tuolumne County Behavioral Health.** On June 13, 2007, Plaintiff was initially evaluated at Tuolumne County Behavioral Health, which was to provide psychiatric supervision in lieu of the parole system because of the distance from Plaintiff's home to the nearest parole office. Presenting problems included inability to keep a train of thought, forgetfulness, lack of clear goals, difficulty expressing feelings, apathy, fatigue, and sluggishness. Plaintiff heard voices, experienced visual hallucinations, and was paranoid and irritable. Social worker Linda Torkend, M.S.W., noted that Plaintiff's caregiver, who completed the behavioral checklist, reported symptoms that Plaintiff denied.

Plaintiff was then using nicotine and caffeine daily. He had recently consumed a single alcoholic beverage. He had tried methamphetamine a few times four years previously.

Plaintiff's intake diagnosis was:

Axis I:        Psychotic Disorder, Not Otherwise Specified (298.9)

Axis II:       Deferred (799.9)

---

[5] GAF 85 is at the midpoint of the range GAF 81-90, which indicates "**Absent or minimal problems** (e.g., mild anxiety before an exam), **good functioning in all areas, interested and involved in a wide range of activities, socially effective, generally satisfied with life, no more than everyday problems or concerns** (e.g., an occasional argument with family members)." DSM IV TR at 34.

Axis III:      Severe head injuries
                  Back injury, chronic pain

Axis IV:

Axis V:       GAF=43

AR 215.[6]

TCBH did not consider Plaintiff to have a substance abuse issue.  Initiation of treatment was delayed since TCBH then lacked a psychiatrist.

On September 10, 2007, psychiatrist Peter Gleason, M.D., recommended group rehabilitation and case management.  His diagnosis of Plaintiff was:

Axis I:        Schizoaffective Disorder
              Rule Out Organic Affective Disorder

Axis II:       Antisocial traits

Axis III:      History of head trauma, rule our seizures, slowing

Axis IV:      Moderate, recent incarceration

Axis V:       Current GAF=50   Last Year GAF=50

AR 221.

Gleason described Plaintiff's diagnosis as guarded.  He ordered an EEG.

Plaintiff was re-evaluated on October 22, 2007.  Gleason noted that Plaintiff was unable to work because of auditory hallucinations, ideas of mind reading, and ideas of reference.[7]  His mood was "fairly stable" on medication.  Although he was well-oriented, Plaintiff displayed odd affect with incongruous mood, mildly impaired judgment, and disorganized and concrete thought processes.  Gleason recommended that Plaintiff attend the group day program, and noted that he

///

---

[6] GAF 43 is near the bottom of the range GAF 41-50, which indicates "Some impairment in reality testing or communication (e.g., speech is sometimes illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school)."  DSM IV TR at 34.

[7] An individual who has ideas of reference believes that "irrelevant, unrelated or innocuous phenomena in the world relate to them directly or have a special personal significance: 'the notion that everything one perceives in the world relates to one's own destiny.'" en.wikipedia.org/wiki/Ideas_of_reference_and_delusions_of_reference (August 10, 2011).

1  "may be a candidate for supervised housing."  AR 219.  Plaintiff declined the offer of day

2  programming.

3      Plaintiff continued treatment at TCBH, where he was consistently reported compliant

4  with medications.  On December 21, 2007, Gleason noted early symptoms of tardive dyskinesia.[8]

5  Plaintiff declined changing medications to minimize the risk of abnormal involuntary

6  movements.

7      On June 9, 2008, psychiatrist Lillian R. Boone, M.D., prepared a follow-up evaluation,

8  noting Plaintiff's anxiety about securing disability benefits and satisfying his parole officer.  His

9  affect was odd.  He had chronic delusions and occasional auditory hallucinations.  His insight

10  was mildly impaired.

11      On Jul 24, 2008, Plaintiff told psychiatrist Stanley Dugan, M.D., that he was stressed by

12  the denial of his SSI application. He was recently feeling tired, "spacey," and anxious.  On

13  September 11, 2008, Boone evaluated Plaintiff, who complained of dry mouth caused by

14  medications and of stress.  He was feeling the loss of his father greatly.

15      References in the medical notes indicate that TCBH also provided Plaintiff with

16  individual therapy independent of his treatment by psychiatrists.

17      **Internal Medicine Consultation.**  On July 21, 2007, Satish Sharma, M.D., provided a

18  summary report of an internal medicine consultation of Plaintiff for the agency.[9]  Sharma noted

19  tenderness of Plaintiff right knee to palpation and pain and crepitation on flexion of the right

20  knee at 100°.  Sharma also noted tenderness to palpation of the superolateral aspect of Plaintiff's

21  left shoulder, with pain on abduction at 120°, and pain on internal rotation of 30°.  Sharma

22  diagnosed:

23      1.    Depression, mood swings, schizophrenia, auditory hallucinations, and psychotic features.

24

25  [8] Tardive dyskinesia is a neurological symptom caused by long-term use of neuroleptic drugs, characterized
26 by repetitive, involuntary, and purposeless movements such as grimacing, tongue protrusion, lip smacking, puckering and pursing, and eye blinking.  www.ninds.nih.gov/disorders/tardive/tardive.htm (August 8, 2011).  No treatment
27 exists other than discontinuation or minimization of neuroleptic drugs.  *Id.*

28  [9] Although Sharma claims to be "board eligible" in neurology and internal medicine, he is neither a neurologist nor an internist.

2.      Headaches combination of muscle tension and vascular headaches.

3.      Problems with memory.  Memory recall was three of three words immediately and two of three words after five minutes.

4.      Left shoulder pain secondary to tendinitis.

5.      Right knee pain, status post meniscus tear, has decreased motion in right knee and also tenderness to palpation of right knee.  Right knee pain secondary to degenerative joint disease.

AR 161.

Sharma's functional capacity assessment was:

Based upon today's physical examination and observations, the claimant has limitation in standing and walking to 6 hours per day with normal breaks. Limitation in reaching, pushing, and pulling objects with left arm to occasionally. Limitation to lifting 25 pounds.  There are no limitations in holding, fingering or feeling objects.  There are no limitations in speech, hearing, or vision.

AR 161.

Sharma opined that Plaintiff did not appear capable of managing his own funds.

**Physical residual functional capacity assessment.**  On August 15, 2007, agency staff physician D.D. Sharbaugh, M.D., completed a physical residual capacity assessment.  Sharbaugh opined that Plaintiff could lift 50 pounds occasionally and 25 pounds frequently; could stand or walk six hours in an eight-hour workday, could sit six hours in an eight-hour workday; had unlimited ability to push or pull; could frequently climb, balance, and stoop; and could occasionally kneel, crouch, and crawl.

**Psychological evaluation.**  On August 16, 2007, Richwerger completed a psychological evaluation on behalf of the agency. The only record that Richwerger was given to review was Zimmerman's May 17, 2007 evaluation.  Plaintiff told Richwerger that, since his 1989 head injury, he has heard voices and sometimes felt depressed.  He last heard voices three weeks before.  He reported problems with concentration and memory, indicating that he could not remember instructions well.

Plaintiff denied "troubling thoughts," or feeling anxious and depressed.  He denied current suicidal thoughts but reported that such thoughts in 1989 triggered the beating by

///

10

sheriff's deputies.  He denied current homicidal thoughts, explaining that he only had such thoughts if he did not take his medication.

Plaintiff told Richwerger that he has received outpatient psychiatric treatment since 1990, seeing the psychiatrist once every one or two months.  He was currently seeing a therapist and a psychiatrist at Kings View Mental Health but could not remember their names.  He also was seeing a parole psychologist named "Dr. Zimmer."  Plaintiff told Richwerger that he went to Atascadero in 2006  "because of my head injury and to get my medications straightened out."

According to Plaintiff, he used to drink alcohol on weekends but quit years ago.  Similarly, he used to use methamphetamine but stopped ten years before.

Plaintiff was fully oriented for Richwerger's evaluation.  His speech was slurred: Richwerger suggested the slurring was a medication side effect.  Plaintiff demonstrated a normal ability to follow simple instructions, but had "significant difficulty with complex tasks."  AR 174.  He scored in the first percentile on memory tests and the tenth percentile on concentration and attention.  He scored in the low range on tests of abstractions.  He displayed "no evidence of hallucinations, delusions, bizarre behavior, or response to internal stimuli."  AR 175.

Richwerger administered the Wechsler Adult Intelligence Scale III, on which Plaintiff scored verbal IQ, 73 (4th percentile); performance IQ, 69 (2nd percentile); and full scale IQ, 69 (2nd percentile).  His performance was in the normal range on the Bender-Gestalt II test of visual motor skills.  Plaintiff scored in the borderline range on Trails A, and in the impaired range on Trails B.[10]  On the Wechsler Memory Scales III, Plaintiff scored in the third percentile for auditory immediate memory; the second percentile, visual immediate memory; first percentile, overall immediate memory; and the tenth percentile, working memory (attention/concentration).  Richwerger commented that Plaintiff's memory problems could be attributable to either his brain injury or his medications.

---

[10]  The trails tests are administered to measure spatial organization, graphomotor speed, recognition of numbers, visual pursuit, vigilance, and number sequences.  www.neuro.psych.memphis.edu/neuropsyc/np-test1.htm (August 8, 2011).  Trails A also measures rote memory.  *Id.*  Trails B measures the distinction between letters and numbers, integrating two independent series, ability to learn an organizing principle and apply it systematically, serial retention and integration, verbal problem solving, and planning.  *Id.*  Poor performance on Trails B is considered an indicator of damage to the brain's frontal lobe.  *Id.*

Richwerger diagnosed Plaintiff:

Axis I:         Psychotic disorder, not otherwise specified
                Cognitive disorder, not otherwise specified, mild, possibly secondary to
                head trauma and medication

Axis II:        Cluster B Personality traits
                Rule out borderline intellectual functioning.  Based on Plaintiff's profile
                scores, it appears that there may be some prior difficulties in this area.
                The claimant's profile did appear somewhat consistent with borderline
                intellectual functioning

Axis III:       As discussed

Axis IV:        Employment related concerns, support system related concerns

Axis V:         GAF is 50

AR 176.[11]

Richwerger opined that Plaintiff's condition was "likely chronic."  He questioned the

assumption that Plaintiff's psychosis arose from the sheriff's attack.  His functional assessment

of Plaintiff was:

The claimant appears to have marked to extreme impairment in his ability to
perform detailed and complex tasks.

The claimant appears to have slight to moderate impairment in his ability to
perform simple and repetitive tasks.

The claimant appears to have moderate to marked impairment in his ability to
perform work activities on a consistent basis.

The claimant appears to have slight impairment in his ability to perform work
activities without special supervision.

The claimant appears to have moderate to marked impairment in his ability to
complete a normal workday or workweek without interruption from a psychiatric
condition.

The claimant appears to have moderate impairment in his ability to understand
and accept instructions from supervisors.

The claimant appears to have moderate impairment in his ability to interact with
coworkers and the public.

The claimant appears to have slight impairment in his ability to maintain regular
attendance in the workplace.

---

[11]  Cluster B personality traits include antisocial personality disorder, borderline personality disorder,
histrionic personality disorder, and narcissistic personality disorder.  DSM IV TR at 701-717.

The claimant appears to have marked impairment in his ability to deal with the usual stresses encountered in competitive work.

AR177.

**Psychiatric review technique.**  Agency physician E. B. Aquino-Caro, M.D., performed the psychiatric review technique on August 24, 2007.  Categorizing Plaintiff as having an affective disorder, but not schizophrenia or another psychotic disorder, Aquino-Caro opined that Plaintiff had mild restriction of activities of daily living; mild difficulties in maintaining social functioning; mild difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation.  Aquino-Caro found that Plaintiff had no significant limitations except for moderate limitations in carrying out detailed instructions

**Vocational expert testimony.** Steven Schmidt testified as the vocational expert.  For the first hypothetical questions, the ALJ directed Schmidt to assume a 44-year-old individual, educated to the eleventh grade, who is literate and has no past work; could lift fifty pounds occasionally and twenty-five pounds frequently; is capable of standing and walking in combination for at least six hours in a workday; is capable of sitting at least six hours in a workday; is limited to work involving simple instructions; and must have restricted contact[12] with both the public and co-workers.  Schmidt replied that such an individual could perform work including hand packer (DOT No. 920587018, medium, SVP2), 37,000 jobs available in California; machine operator (DOT No. 920685078, medium, SVP 2), 31,000 jobs available in California; and dishwasher (DOT No. 318687010, medium, SVP 2), 19,000 jobs available in California.

For the second hypothetical question, the ALJ directed Schmidt to assume that the hypothetical individual was limited to occasional reaching, pushing, and pulling with his nondominant (left) arm.  Schmidt testified that the addition of that limitation would eliminate the jobs identified in hypothetical one.

///

---

[12]  The ALJ defined restricted contact to mean that Plaintiff could work in the presence of others but could not be part of a work team or cooperative work process.

For the third hypothetical question, the ALJ directed Schmidt to assume that the hypothetical individual would be moderately unable to perform work activities on a consistent basis.  In response to Schmidt's request that he define "moderate," the ALJ replied:

> If we define as the individual would be off task during a period where instead of having to perform–be able to get out 100 widgets they can only perform and get out 80 widgets so they're off task 10 to 20 percent of the time.

AR 32-33.

Schmidt replied that such an individual would not be able to perform the jobs listed in response to hypothetical one.

Plaintiff's attorney objected that the ALJ should favor the opinion of Richwerger, who actually tested Plaintiff.  Plaintiff's attorney did not present any additional hypothetical questions.

## II.   Discussion

### A.   Legal Standards

To qualify for benefits, a claimant must establish that he or she is unable to engage in substantial gainful activity because of a medically determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. § 1382c (a)(3)(A).  A claimant must demonstrate a physical or mental impairment of such severity that he or she is not only unable to do his or her previous work, but cannot, considering age, education, and work experience, engage in any other substantial gainful work existing in the national economy.  *Quang Van Han v. Bowen*, 882 F.2d 1453, 1456 (9th Cir. 1989).

To encourage uniformity in decision making, the Commissioner has promulgated regulations prescribing a five-step sequential process for evaluating an alleged disability.  20 C.F.R. §§ 404.1520 (a)-(f); 416.920 (a)-(f).  The process requires consideration of the following questions:

Step one:     Is the claimant engaging in substantial gainful activity?  If so, the claimant is found not disabled.  If not, proceed to step two.

Step two:     Does the claimant have a "severe" impairment?  If so, proceed to step three.  If not, then a finding of not disabled is appropriate.

| | | |
|---|---|---|
| Step three: | Does the claimant's impairment or combination of impairments meet or equal an impairment listed in 20 C.F.R., Pt. 404, Subpt. P, App. 1?  If so, the claimant is automatically determined disabled. If not, proceed to step four. | |
| Step four: | Is the claimant capable of performing his past work?  If so, the claimant is not disabled.  If not, proceed to step five. | |
| Step five: | Does the claimant have the residual functional capacity to perform any other work?  If so, the claimant is not disabled.  If not, the claimant is disabled. | |

*Lester v. Chater*, 81 F.3d 821, 828 n. 5 (9th Cir. 1995).

The ALJ found that Plaintiff had not engaged in substantial gainful activity since the alleged onset date of May 23, 2007.  His severe impairment included psychotic disorder NOS and degenerative joint disease of the left knee.  Neither impairment met or equaled any of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 416.920(d), 416.925, and 416.926).  (The ALJ evaluated the evidence in light of 20 C.F.R. Part 404, Subpart P, Appendix 1, §§ 1.02 (major dysfunction of a joint) and 12.03 (schizophrenic, paranoid and other psychiatric disorders).)  Plaintiff had no past relevant work.  The ALJ concluded that Plaintiff had the residual functional capacity to lift fifty pounds occasionally and twenty-five pounds frequently, and to sit, stand, or walk for six hours in an eight-hour workday.  He was limited to work involving simple instructions, with restricted contact with co-workers and the public.  He could not be part of a work team or cooperative work process.  Accordingly, Plaintiff was not under a disability.

**B.    Scope of Review**

Congress has provided a limited scope of judicial review of the Commissioner's decision to deny benefits under the Act.  In reviewing findings of fact with respect to such determinations, a court must determine whether substantial evidence supports the Commissioner's decision.  42 U.S.C. § 405(g).  Substantial evidence means "more than a mere scintilla" (*Richardson v. Perales*, 402 U.S. 389, 402 (1971)), but less than a preponderance.  *Sorenson v. Weinberger*, 514 F.2d 1112, 1119 n. 10 (9th Cir. 1975).  It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401.  The record as a whole must be considered, weighing both the evidence that supports and the evidence that

15

1   detracts from the Commissioner's decision. *Jones v. Heckler*, 760 F.2d 993, 995 (9ᵗʰ Cir. 1985).

2   In weighing the evidence and making findings, the Commissioner must apply the proper legal

3   standards. *See, e.g., Burkhart v. Bowen*, 856 F.2d 1335, 1338 (9ᵗʰ Cir. 1988). This Court must

4   uphold the ALJ's determination that the claimant is not disabled if the ALJ applied the proper

5   legal standards, and if the ALJ's findings are supported by substantial evidence. *See Sanchez v.*

6   *Secretary of Health and Human Services*, 812 F.2d 509, 510 (9ᵗʰ Cir. 1987).

7          **C.    Physicians' Expert Opinions**

8          "[T]he ALJ must identify what testimony is not credible and what evidence undermines

9   the claimant's complaints." *Lester*, 81 F.3d at 834, *quoting Varney v. Secretary of Health and*

10  *Human Services*, 846 F.2d 581, 584 (9ᵗʰ Cir. 1988). He or she must set forth specific reasons for

11  rejecting the claim, explaining why the testimony is unpersuasive. *Orn v. Astrue*, 495 F.3d 625,

12  635 (9ᵗʰ Cir. 2007). *See also Robbins v. Social Security Admin.*, 466 F.3d 880, 885 (9ᵗʰ Cir.

13  2006). The credibility findings must be "sufficiently specific to permit the court to conclude that

14  the ALJ did not arbitrarily discredit claimant's testimony." *Thomas v. Barnhart*, 278 F.3d 947,

15  958 (9ᵗʰ Cir. 2002).

16         Plaintiff contends that the ALJ arbitrarily rejected medical testimony supporting his claim

17  of disability, particularly the report of Dr. Richwerger, to which the ALJ gave reduced weight,

18  explaining that Richwerger relied on the Plaintiff's subjective representations. The ALJ

19  considered Plaintiff to lack credibility. The Commissioner responds that the ALJ's

20  determination is entitled to deference as the final arbiter of ambiguities in the medical record.

21         This Court rejects both the ALJ's embrace of Dr. Aquino-Caro's psychiatric review

22  technique and the proposition that the medical opinions as a group were "ambiguous." Except

23  for Dr. Aquino-Caro's analysis as one of the Commissioner's staff physicians, the medical

24  opinions consistently described Plaintiff as being affected by psychosis interwoven with an

25  affective disorder. The ALJ himself identified psychosis as Plaintiff's severe psychological

26  impairment. Only Dr. Aquino-Caro disagreed. A careful analysis of the record as a whole shows

27  no basis for favoring Aquino-Caro's opinion, which inexplicitly ignored Plaintiff's twenty-year

28  history of psychotic illness, multiple hospitalizations, hallucinations and delusions, and response

1   to anti-psychotic drugs, and concluded that Plaintiff had nothing more than an affective disorder

2   that resulted in only mild impairments.

3            **1.      Plaintiff's Credibility**

4            Because the ALJ's rejection of Dr. Richwerger's opinion relied on his conclusion that

5   Plaintiff's subjective complaints were not credible, the first issue is Plaintiff's credibility.

6   Substantial evidence did not support the ALJ's conclusion that Plaintiff was not credible because

7   he had lied about abusing alcohol.

8            An ALJ is not "required to believe every allegation of disabling pain" or other non-

9   exertional requirement.  *Orn*, 495 F.3d at 635, *quoting Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir.

10  1989).  But if he or she decides to reject a claimant's testimony after a medical impairment has

11  been established, the ALJ must make specific findings assessing the credibility of the claimant's

12  subjective complaints.  *Ceguerra v. Secretary of Health and Human Services*, 933 F.2d 735, 738

13  (9th Cir. 1991). "[T]he ALJ must identify what testimony is not credible and what evidence

14  undermines the claimant's complaints."  *Lester*, 81 F.3d at 834, *quoting Varney*, 846 F.2d at 584.

15  *See also Robbins*, 466 F.3d at 885.  The credibility findings must be "sufficiently specific to

16  permit the court to conclude that the ALJ did not arbitrarily discredit claimant's testimony."

17  *Thomas*, 278 F.3d at 958.

18           When weighing a claimant's credibility, the ALJ may consider the claimant's reputation

19  for truthfulness, inconsistencies in claimant's testimony or between her testimony and conduct,

20  claimant's daily activities, claimant's work record, and testimony from physicians and third

21  parties about the nature, severity and effect of claimant's claimed symptoms.  *Light v. Social

22  Security Admin.*, 119 F.3d 789, 792 (9th Cir. 1997).  The ALJ may consider "(1) ordinary

23  techniques of credibility evaluation, such as claimant's reputation for lying, prior inconsistent

24  statements concerning the symptoms, and other testimony by the claimant that appears less than

25  candid; (2) unexplained or inadequately explained failure to seek treatment or to follow a

26  prescribed course of treatment; and (3) the claimant's daily activities."  *Tommasetti v. Astrue*,

27  533 F.3d 1035, 1039 (9th Cir. 2008), *citing Smolen v. Chater*, 80 F.3d 1273 (9th Cir. 1996).  If the

28  ///

17

1    ALJ's finding is supported by substantial evidence, the Court may not second-guess his or her

2    decision. *Thomas*, 278 F.3d at 959.

3        The Ninth Circuit has summarized the applicable standard:

4        [T]o discredit a claimant's testimony when a medical impairment has been
         established, the ALJ must provide "'specific cogent reasons for the disbelief.'"
5        *Morgan*, 169 F.3d [595,] 599 [9th Cir. 1999) (quoting *Lester*, 81 F.3d at 834).  The
         ALJ must "cit[e] the reasons why the [claimant's] testimony is unpersuasive." *Id.*
6        Where, as here, the ALJ did not find "affirmative evidence" that the claimant was
         a malingerer, those "reasons for rejecting the claimant's testimony must be clear
7        and convincing." *Id.*  Social Security Administration rulings specify the proper
         bases for rejection of a claimant's testimony . . . An ALJ's decision to reject a
8        claimant's testimony cannot be supported by reasons that do not comport with the
         agency's rules. *See* 67 Fed.Reg. at 57860 ("Although Social Security Rulings do
9        not have the same force and effect as the statute or regulations, they are binding
         on all components of the Social Security Administration, . . . and are to be relied
10       upon as precedent in adjudicating cases."); *see Daniels v. Apfel*, 154 F.3d 1129,
         1131 (10th Cir. 1998) (concluding the ALJ's decision at step three of the disability
11       determination was contrary to agency rulings and therefore warranted remand).
         Factors that an ALJ may consider in weighing a claimant's credibility include
12       reputation for truthfulness, inconsistencies in testimony or between testimony and
         conduct, daily activities, and "unexplained, or inadequately explained, failure to
13       seek treatment or follow a prescribed course of treatment." *Fair*, 885 F.2d at 603;
         *see also Thomas*, 278 F.3d at 958-59.

14
     *Orn*, 495 F.3d at 635.
15
         The ALJ expressed a single reason for finding Plaintiff to lack credibility:
16
17       [T]he claimant told [Dr. Richwerger] that he quit drinking alcohol years ago,
         whereas one month earlier he reported that he drank one beer a week.  Clearly, the
18       claimant has been less than forthright in regard to his use of alcohol, and the
         "slight slurring" noted by the doctor could well be the result of alcohol use, which
19       would have affected his performance on the test.

20   AR 17.

21       The ALJ's conclusion relies on two pieces of evidence.  On June 13, 2007, in a detailed

22   questionnaire addressing various psychoactive substances, most recent consumption, and

23   frequency of consumption, a TCBH social worker noted that Plaintiff reported having consumed

24   a single drink on June 11, 2007, and that he had used alcohol one to three times in the past

25   month.  AR 214.  On August 16, 2007, Plaintiff told Richwerger "that he used to drink alcohol

26   on weekends but he quit years ago."  Although the ALJ may be correct that Plaintiff has been less

27   than candid regarding his use of alcohol, this evidence could indicate nothing more than a single

28   indulgence that Plaintiff, whom the record established to have memory problems, had forgotten

                                              18

in the intervening two months.  In itself, this evidence is hardly a substantial limb from which to hang a conclusion that Plaintiff is a liar, a rejection of the detailed opinions of the agency's own consultant, and ultimately, Plaintiff's eligibility for SSI benefits.

Nothing in the record supports the ALJ's conjecture that Plaintiff was sufficiently inebriated at Richwerger's examination to slur his speech.  Indeed, nothing in the record suggested that Plaintiff abused alcohol in the time period between his application for benefits and the hearing.

Nonetheless, the ALJ questioned Richwerger's attributing Plaintiff's speech problems to the side effects of his medication.  One has to question whether an expert psychologist, retained by the agency to evaluate Plaintiff's psychological condition, would not have recognized and commented on a claimant sufficiently drunk to slur his speech, or would have erroneously attributed a drunken claimant's slurred speech to the side effects of medication.  In fact, the record reflects that Plaintiff had developed tardive dyskinesia, involuntary movements associated with long-term medication with antipsychotic medications.  Among the effects of tardive dyskinesia are speech disorders related to disorders of the muscles of the neck and face, particularly the fine muscles involved in speech and swallowing. www.tardivedyskinesia.com/symptoms/vocalizations-breathing-swallowing.php (August 8, 2011).

Involuntary motion of the mouth and tongue can also lead to denture problems and tongue ulcerations.  www.tardive-dyskinesia.com (August 8, 2011).  Plaintiff's slurred speech could be caused by his tardive dyskinesia.  Finally, the record includes numerous mentions first to Plaintiff's teeth being missing or in poor condition, then to Plaintiff's loss of his dentures and need to replace them.  Dental problems and missing dentures are also likely suspects in garbled speech.

Substantial evidence did not support the ALJ's conclusion that because he misrepresented his alcohol use, Plaintiff lacked credibility.

///

///

1          2.    **Physicians' Opinions**

2          Three types of physicians may offer opinions in social security cases: "(1) those who

3   treat[ed] the claimant (treating physicians); (2) those who examine[d] but d[id] not treat the

4   claimant (examining physicians); and (3) those who neither examine[d] nor treat[ed] the claimant

5   (nonexamining physicians)." *Lester*, 81 F.3d at 830.  A treating physician's opinion is generally

6   entitled to more weight that the opinion of a doctor who examined but did not treat the claimant,

7   and an examining physician's opinion is generally entitled to more weight than that of a non-

8   examining physician. *Id.*  The Social Security Administration favors the opinion of a treating

9   physician over that of nontreating physicians. 20 C.F.R. § 404.1527; *Orn*, 495 F.3d at 631.  A

10  treating physician is employed to cure and has a greater opportunity to know and observe the

11  patient. *Sprague v. Bowen*, 812 F.2d 1226, 1230 (9th Cir. 1987).

12         Plaintiff provided medical records from six treating physicians: (1) psychiatrist Hadley

13  Orran, M.D., of Atascadero State Hospital; (2) psychologist G. Zimmerman and psychiatrist

14  Jaime Ortiz, M.D., of the Parole Outpatient Clinic; and (3) psychiatrists Peter Gleason, M.D.,

15  Lillian Boone, M.D., and Stanley Dugan M.D., of Tuolumne County Behavioral Health.

16  Although their precise terminology varied and Plaintiff's condition improved and worsened from

17  appointment to appointment, their diagnoses were remarkably consistent, including a psychotic

18  disorder with an affective component, antisocial personality traits, a history of head injuries that

19  were a possible origin of Plaintiff's illness or intellectual disability or both, and exacerbation of

20  Plaintiff's symptoms when he was under stress or failed to comply with his medication regiment.

21         An ALJ may disregard the opinion of a treating physician even if it is uncontradicted.

22  *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989).  But if he or she chooses to do so, the

23  ALJ must provide "specific and legitimate reasons" supported by substantial evidence in the

24  record. *Lester*, 81 F.3d at 830-31.  An ALJ can meet this requirement by setting forth a detailed

25  and thorough factual summary, including all conflicting testimony; then articulating his or her

26  interpretation of this evidence; and finally, setting forth his or her findings. *Magallanes*, 881

27  F.2d at 751.  The ALJ cannot merely set forth conclusions; he or she must provide his or her own

28  interpretation and explain why it, rather than the doctors' interpretations, are correct. *Embrey v.*

*Bowen*, 849 F.2d 418, 421-22 (9th Cir. 1988).  The regulations provide that medical opinions be

evaluated by considering (1) the examining relationship; (2) the treatment relationship, including

(a) the length of the treatment relationship or frequency of examination, and the (b) nature and

extent of the treatment relationship; (3) supportability; (4) consistency; (5) specialization; and (6)

other factors that support or contradict a medical opinion.  28 C.F.R. § 404.1527(d).

Physicians render two types of opinions in disability cases: (1) medical, clinical opinions

regarding the nature of the claimant's impairments and (2) opinions on the claimant's ability to

perform work.  *See Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998).  Although an ALJ is not

bound by opinions rendered by Plaintiff's physicians regarding the ultimate issue of disability, he

or she cannot reject them out of hand, but must set forth clear and convincing reasons for

rejecting them.  *Matthews v. Shalala*, 10 F.3d 678, 680 (9th Cir. 1993).  A general statement that

objective factors or the record as a whole are insufficient: the ALJ must tie the objective factors

or the record as a whole to the opinions and findings that he or she rejects.  *Embrey*, 849 F.2d at

422.

No treating physician rendered an opinion regarding Plaintiff's residual functional

capacity.  The only opinions on Plaintiff's residual functional capacity were provided by

Richwerger, an examining physician, and Aquino-Caro, a non-examining physician required

careful.  To assess these opinions on Plaintiff's ability to perform work requires the Court to pay

careful attention to the conditions and treatments reflected in the treating physicians' notes in

light of the six regulatory factors.  28 C.F.R. § 404.1527(d).

**Osran.**  Psychiatrist Osran treated Plaintiff during the more than six months that Plaintiff

was psychiatrically hospitalized after having expressed suicidal ideation while incarcerated at

CMC.  Although the ALJ acknowledged that Plaintiff was transferred from California Men's

Colony to Atascadero State Hospital pursuant to California Penal Code § 2684(a) (Transfer to

state hospital; mentally ill, mentally deficient, or insane prisoner), the hearing decision never

acknowledges that Plaintiff was residing in a state psychiatric hospital while Osran was treating

him.  Instead of focusing on the seriousness of psychiatric hospitalization, the hearing decision

mechanistically recites random factoids from Plaintiff's medical records, emphasizing notes

1  reporting that Plaintiff indicated amelioration of symptoms, and inexplicably focusing on minute

2  details of Plaintiff's hepatitis diagnosis, which is not at issue in this disability determination.

3     Osran's treatment notes reflect that proper dosages of antipsychotic drugs reduced, but

4  did not eliminate, Plaintiff's auditory and visual hallucinations, even in the controlled confines of

5  a psychiatric hospital.  Nor did medication resolve Plaintiff's depressive symptoms, particularly

6  that he was sleeping three-quarters of the day yet complained of fatigue.  Osran's notes are

7  consistent with those on his other treating psychiatrists, who reported similar symptoms and the

8  failure of Plaintiff's medications to control his psychotic and depressive symptoms in a

9  consistently effective manner.

10     **Parole Outpatient Clinic.**  The  responsibility of the Parole Outpatient Clinic was to

11  continue Plaintiff's mental health treatment after he was released on parole.  Because the parole

12  office was fifty miles from Plaintiff's home, Plaintiff's ongoing mental health treatment was

13  eventually delegated to Tuolomne County Behavioral Health (TCBH). With the help of social

14  worker June Henry, Zimmerman performed an initial parole mental health assessment.

15  Psychiatrist Ortiz treated Plaintiff by teleconference until TCBH had hired a psychiatrist who was

16  available to treat Plaintiff.

17     Consistent with Osran and TCBH, Zimmerman observed that Plaintiff was irritable and

18  paranoid, with subnormal attention, concentration, insight, and judgment.  His initial assessment

19  reflected that, immediately following his parole, Plaintiff was having difficulty contacting his

20  sister and was failing to consistently comply with medication.  These concerns were consistent

21  with Plaintiff's mother's later report to the agency that Plaintiff was unable to manage the timing

22  of his own prescriptions and required family assistance to take medications consistently and on

23  time.  Ortiz's reports indicated that Plaintiff's condition stabilized once he was living at home

24  and complying with medications.

25     **Tuolomne County Behavioral Health.**  Consistent with Plaintiff's prior treating

26  physicians, TCBH's initial evaluation indicated Plaintiff's inability to keep a train of thought,

27  forgetfulness, lack of clear goals, difficulty expressing feelings, apathy, fatigue, and sluggishness.

28  Plaintiff heard voices, experienced visual hallucinations, and was paranoid and irritable.  The

intake social worker noted that Plaintiff's family observed and reported symptoms that Plaintiff denied.

Although no TCBH physician prepared a formal residual functional capacity analysis, Gleason's notes indicated that even though Plaintiff's condition was fairly stabilized by medication, his auditory hallucinations, and ideas of mind reading and reference precluded his employment. Gleason's opinion constitutes an impermissible opinion of disability reserved to the Commissioner. An ALJ is "not bound by an expert medical opinion on the ultimate question of disability." *Tomasetti*, 533 F.3d at 1041; Social Security Ruling 96-5p. "Although a treating physician's opinion is generally afforded the greatest weight in disability cases, it is not binding on an ALJ with respect to the existence of an impairment or the ultimate determination of disability." *Tonapetyan v. Halter*, 242 F.3d 1144, 1149 (9th Cir. 2001). Nonetheless, Gleason's notes identified three components of Plaintiff's psychosis relevant to the Commissioner's assessment of whether Plaintiff's impairments render him disabled.

The TCBH physicians' notes record the continued presence, despite Plaintiff's compliance with medication, of delusions and hallucinations. And, for the first time, the TCBH physicians focused on Plaintiff's developing the repetitive, involuntary, and purposeless movements that characterize tardive dyskinesia, attributable to the extended use of neuroleptic medications. Gleason recommended Plaintiff's attendance at a day therapy program and considered the propriety of a supervised living situation.

**Richwerger.** Despite the extensive longitudinal records that ultimately comprised the agency record, Richwerger, who examined Plaintiff as an agency consultant, was given only Zimmerman's May 17, 2007 evaluation for the Parole Outpatient Program. Despite this paucity of recorded medical history, the factual bases on which Richwerger based his opinion are remarkably consistent with the treatment notes of the various treating physicians.

Richwerger first reported on Plaintiff's own account of his symptoms and medical history, the "subjective information" for which the ALJ rejected his opinion (*see discussion above*). Plaintiff's representations were consistent with his previous representations as well as

///

his treating physicians' notes.  Richwerger was skeptical of certain of Plaintiff's reports, in particular, Plaintiff's belief that his psychosis arose from the 1989 police beating.

Richwerger then administered a battery of psychological tests, an exercise in which educational psychologists such as he are particularly trained and especially skillful.  These tests provided objective evidence of Plaintiff's low intelligence, normal visual motor skills, poor memory, and inability to strategize to solve problems.  Richwerger's analysis of the combined subjective and objective information led to his assessment of Plaintiff's abilities in eight areas, as set forth in the account off the agency record above.

**Aquino-Caro.**  Despite agency policy favoring the opinions of treating and examining physicians, the ALJ gave "great weight" to the perfunctory opinion of Dr. Aquino-Caro, an agency staff physician who did not examine Plaintiff.  Aquino-Caro opine that Plaintiff only had an affective disorder, not the psychosis that the ALJ found to be one of Plaintiff's severe impairments.

Aquino-Caro's specialty is not disclosed.  His or her conclusory opinions are provided on a check-off form of the type that would not be accepted from a plaintiff's treating or examining physician.  Aquino-Caro articulates no basis of support for his or her opinions, which are inconsistent with Plaintiff's medical records and the objective data derived from testing conducted by the agency's own consultant.  In short, all regulatory criteria weigh against favoring Aquino-Caro's opinion.  28 C.F.R. § 404.1527(d).  The ALJ erred in doing so.

### 3.    <u>Disregard of Lay Opinions</u>

The hearing decision acknowledged the third-party report of Plaintiff's mother only insofar as it addressed Plaintiff's physical abilities and limitations.  Although Plaintiff did not raise as an issue the ALJ's failure to fully consider his mother's opinions, the Court, on its own motion, notes that the ALJ's ignoring Plaintiff's mother's accounts of his family's efforts to ensure Plaintiff's compliance with his medications and treatment, to assist Plaintiff in performing the activities of daily living, and to protect Plaintiff and the community from each other deserved comment in the hearing decision.

///

1   The ALJ clearly erred.  "Lay testimony as to a claimant's *symptoms* is competent

2   evidence which the Secretary must take into account, unless he ultimately determines to

3   disregard such testimony, in which case 'he must give reasons that are germane to each

4   witness.'" *Nguyen v. Chater*, 100 F.3d 1462, 1467 (9th Cir. 1996), *quoting Dodrill v. Shalala*, 12

5   F.3d 915, 919 (9th Cir. 1993).  Friends and family members who are in a position to observe the

6   claimant's symptoms and daily activities are competent to testify about their observations of the

7   claimant's condition.  *Dodrill*, 12 F.3d at 918-19.  An ALJ's disregard of the testimony of friends

8   and family members violates the regulations, which provide for consideration of the observations

9   of non-medical sources regarding the effects of the claimant's impairments on his ability to work.

10  *Id., citing* 20 C.F.R. § 404.1513(e)(2).[13]  *See also Sprague*, 812 F.2d at 1232.  When a claimant

11  alleges symptoms that are not supported by medical evidence in the record, the agency directs the

12  adjudicator to obtain information about those symptoms from third parties likely to have such

13  knowledge.  SSR 88-13.  The ALJ must give "full consideration" to such testimony.  Id.

14  As outlined in the discussion of the agency record above, Plaintiff's mother's account

15  was consistent with Plaintiff's medical records and well documented the family's extraordinary

16  efforts to support Plaintiff as well as offering insight into the impact of Plaintiff's mental illness

17  on his daily life.  The ALJ erred in failing to incorporate this information into his analysis.

18  **D.      Step Three: Did Plaintiff Satisfy Listing Criteria?**

19  Having concluded that the ALJ erred by rejecting Richwerger's residual functional

20  capacity assessment, the Court, on its own motion, finds it appropriate to re-visit the listing

21  criteria of step three of the disability analysis.  To evaluate disabilities based on mental illness,

22  the agency considers documentation of medically determined impairments, the degree of

23  limitations such impairments cause in the applicant's ability to work, and whether the limitations

24  have lasted or can be expected to last for at least twelve months.  20 C.F.R., Pt. 404, Subpt. P,

25  App. 1, § 12.00 A.  Mental impairments may be evaluated under any one of nine separate

26  categories: organic mental disorders; schizophrenic, paranoid and other psychotic disorders;

27

28      [13]  The relevant section is now designated 20 C.F.R. § 1513 (d)(4).

25

1   affective disorders; mental retardation; anxiety-related disorders; somatoform disorders;

2   personality disorders; substance addiction disorders; or autistic disorders.  20 C.F.R., Pt. 404,

3   Subpt. P, App. 1, § 12.01. As is frequently the case for individuals with mental health problems,

4   Plaintiff has received a variety of diagnoses, generally various combinations of psychosis or

5   schizophrenia, and affective disorders.  The ALJ identified Plaintiff's severe impairment as

6   psychotic disorder, not otherwise specified (Plaintiff's intake diagnosis at TCHB).

7           At step three, the ALJ evaluated Plaintiff using 20 C.F.R., Pt. 404, Subpt. P, App. 1, §§

8   12.03, which addresses schizophrenic, paranoid, and other psychotic disorders.  The structure of

9   the listing is similarly structured to other listings of mental impairments, first providing an

10   introductory statement characterizing the nature of the impairment.  Subpart A of each of listings

11   is tailored to set forth the criteria supporting the specific medical diagnosis.  20 C.F.R., Pt. 404,

12   Subpt. P, App. 1, §12.00A.  Section 12.03 provides:

13           12.03 *Schizophrenic, Paranoid and Other Psychotic Disorders:*
         Characterized by the onset of psychotic features with deterioration from a
14       previous level of functioning.

15           The required level of severity for these disorders in met when the
         requirements in both A and B are satisfied, or when the requirements in C are
16       satisfied.

17           A.  Medically documented persistence, either continuous or intermittent,
         of one or more of the following:

18

19           1.  Delusions or hallucinations; or

20           2.  Catatonic or other grossly disorganized behavior; or

21           3.  Incoherence, loosening of associations, illogical thinking, or
         poverty of content of speech if associated with one of the
         following:

22

23           a.  Blunt affect; or

24           b.  Flat affect; or

25           c.  Inappropriate affect;

         or

26

27           4.  Emotional withdrawal and/or isolation.

         20 C.F.R. Pt. 404, Subpt. P. App. 1, § 12.03(A).
28

26

Because of his continuous, intermittent delusions and visual and auditory hallucinations, as documented throughout his medical records, Plaintiff meets the requirement of subsection A. The ALJ's finding that Plaintiff had "no psychosis on numerous occasions" is nonsensical. Chronic mental illnesses may include periods between bouts of acute symptoms in which the claimant's symptoms, while sufficiently controlled to permit the claimant to live independently, still prevent the claimant from pursuing normal employment. *See, e.g., Esselstrom v. Chater*, 67 F.3d 869, 872-73 (9th Cir. 1995) (addressing claim under 20 C.F.R. 12.03 (schizophrenia)).

Plaintiff had good days, relatively free of symptoms, only when he complied strictly with his regimen of antipsychotic medication. Even then, Plaintiff reported intermittent recurrent auditory hallucinations. His treating physicians observed other delusions including the belief that others could read his mind and delusions of reference. When Plaintiff, who required supervision to know when to take medications, was left on his own and became noncompliant, his hallucinations and delusions increased. As Plaintiff told Richwerger, he only was homicidal if he hadn't had his medicine.

To meet the listing criteria, Plaintiff must also satisfy subsection B:

B.  Resulting in at least two of the following:

     1.  Marked restriction of activities of daily living; or

     2.  Marked difficulties in maintaining social functioning; or

     3.  Marked difficulties in maintaining concentration persistence, or pace; or

     4.  Repeated episodes of decompensation, each of extended duration.

20 C.F.R. Pt. 404, Subpt. P. App. 1, § 12.03(B).

**Daily Living.**  The regulation provides:

*Activities of daily living* include adaptive activities such as cleaning, shopping, cooking, taking public transportation, paying bills, maintaining a residence, caring appropriately for your grooming and hygiene, using telephones and directories, and using a post office.  In the context of your overall situation, we assess the quality of these activities by their independence, appropriateness, effectiveness, and sustainability.  We will determine the extent to which you are capable of initiating and participating in activities independent of supervision or direction.

We do not define "marked" by a specific number of activities of daily living in which functioning is impaired, but by the nature and overall degree of interference

with function.  For example, if you do a wide range of activities of daily living, we may still find that you have a marked limitation in your activities if you have serious difficulty performing them without direct supervision, or in a suitable manner, or on a consistent, useful, routine basis, or without undue interruptions or distractions.

20 C.F.R., Pt. 404, Subpt. P, App. 1, § 12.00 C.1.

"The Social Security Act does not require that claimants be utterly incapacitated to be eligible for benefits." *Fair*, 885 F.2d at 603.  In addition, as specified in the regulation's last paragraph, a claimant's daily functioning must be evaluated in the context of his or her situation. For example, the Ninth Circuit rejected a District Court's conclusion that a claimant's ability to shop, prepare food, and drive proved that he could function outside the supportive residence in which he lived. *Esselstrom*, 67 F.3d at 873.  Citing psychiatric opinions that the claimant needed to remain in a supportive living situation, the Circuit Court noted that the claimant could function in these aspects of his life precisely because he lived within a support group. *Id.*

Plaintiff's need for support in maintaining activities of daily living is implicit throughout the record.  Plaintiff's mother, with the help his siblings, restricted Plaintiff to home unless he was accompanied by a family member. Unable to handle money, Plaintiff could not make change and did not recognize if he were overcharged.  His most recent prison term arose from his putting groceries in a shopping cart, then leaving the store without paying.  He was no longer able to drive and depended on his sister for transportation.  Walking and public transportation were not alternatives since Plaintiff could not identify the bus he needed, and easily became lost and unable to find his way home if he walked.

Plaintiff functioned in his home with family supervision and needed reminders for hygiene and dressing.  He performed simple household chores only with help and supervision.

Plaintiff was unable to accommodate stress of change, which annoyed him.  Continued anxiety and stress exacerbated his psychotic symptoms, particularly hearing voices.  For example, after Plaintiff's father died, he exhibited anxiety and stress, and could not sleep.  He both heard the voices and responded to them.

///

///

Most importantly, Plaintiff's family ensured his compliance with medications and treatment; Gleason observed that he was not compliant after parole and before he moved home.[14] When Plaintiff was not compliant with medication, he lost control of his anger.  He had a history of criminal violence.

At the time of the hearing, Plaintiff functioned day to day because of his large family's ability to cooperate to support and supervise him.  Were his family unavailable, Plaintiff would have had to accept Gleason's offer of a supervisory day program, and might have required the supervised residential setting that Gleason considered.

**Social Functioning.**  The regulatory definition states:

*Social functioning* refers to your capacity to interact independently, appropriately, effectively, and on a sustained basis with other individuals.  Social functioning includes the ability to get along with others, such as family members, friends, neighbors, grocery clerks, landlords, or bus drivers.  You may have demonstrated impaired social functioning by, for example, a ***history of altercations,*** evictions, firings, fear of strangers, avoidance of interpersonal relationships, or ***social isolation***.  You may exhibit strength in social functioning by such things as your ability to initiate social contacts with others, communicate clearly with others, or interact and actively participate in group activities.  We also need to consider cooperative behaviors, consideration for others, awareness of others' feelings, and social maturity.  Social functioning in work situations may involve interaction with the public, responding appropriately to persons in authority (e.g., supervisors), or cooperative behaviors involving coworkers.

We do not define "marked" by a specific number of different behaviors in which social functioning is impaired, but by the nature and overall degree of interference with function.  For example, if you are highly antagonistic, uncooperative, or hostile but are tolerated by local shopkeepers, we may nevertheless find that you have a marked limitation in social functioning because that behavior is not acceptable in other social contexts.

20 C.F.R., Pt. 404, Subpt. P, App. 1, § 12.00 C.2 (*emphasis added*).

Where a claimant was significantly socially isolated except for her AA meetings, the claimant met the criteria for impaired social functioning.  *Holohan v. Massanari*, 246 F.3d 1195, 1204 (9th Cir. 2001).  The Ninth Circuit noted that social isolation except for AA meetings exceeded moderate isolation and qualified as marked isolation.  *Id., n.* 3.  Substantial evidence indicates that Plaintiff's social functioning was nonexistent.

---

[14] Note that Plaintiff was not able simply to move home after he was paroled but struggled to contact his sister so that he could do so.

Except for a family members, Plaintiff was totally isolated.  The ALJ acknowledged Plaintiff's lack of social functioning by specifying that he could work only in jobs that restricted his contact with co-workers and the public, and that Plaintiff could not be part of any team or cooperative work process.

**Concentration, Persistence, and Pace.**  The ALJ concluded that Plaintiff had no difficulty in this area, based on Zimmerman's comment that Plaintiff was alert with adequate attention span.  The corresponding regulatory definition provides:

> *Concentration, persistence, or pace* refers to the ability to sustain focused attention and concentration sufficiently long to permit the timely and appropriate completion of tasks commonly found in work settings.  Limitations in concentration, persistence or pace are best observed in work settings, but also may be reflected by limitations in other settings.  In addition, major limitations in this area can often be assessed through clinical examination or psychological testing.  Wherever possible, however, a mental status examination or psychological test data should be supplemented by other available evidence.

> On mental status examinations, concentration is assessed by tasks such as having you subtract serial sevens or serial threes from 100.  In psychological tests of intelligence or memory, concentration is assessed through tasks requiring short-term memory or through tasks that must be completed within established time limits.

> In work evaluations, concentration, persistence, or pace is assessed by testing your ability to sustain work using appropriate production standards, in either real or simulated work tasks (e.g., filing index cards, locating phone numbers, or disassembling and reassembling objects).  Strengths and weaknesses in areas of concentration and attention can be discussed in terms of your ability to work at a consistent pace for acceptable periods of time and until a task is completed, and your ability to repeat sequences of action to achieve a goal or an objective.

> We must exercise great care in reaching conclusions about your ability or inability to complete tasks under the stresses of employment during a normal workday or work week based on a time-limited mental status examination or psychological testing by a clinician, or based on your ability to complete tasks in other settings that are less demanding, highly structured, or more supportive.  We must assess your ability to complete tasks by evaluating all the evidence, with an emphasis on how independently, appropriately, and effectively you are able to complete tasks on a sustained basis.

> We do not define "marked" by a specific number of tasks that you are unable to complete, but by the nature and overall degree of interference with function.  You may be able to sustain attention and persist at simple tasks but may still have difficulty with complicated tasks.  Deficiencies that are apparent only in performing complex procedures or tasks would not satisfy the intent of this paragraph B criterion.  However, if you can complete many simple tasks, we may nevertheless find that you have marked limitation in concentration, persistence, or pace if you cannot complete these tasks without extra supervision or assistance, or in accordance with quality and accuracy standards, or at a consistent pace without

an unreasonable number and length of rest periods, or without undue interruptions or distractions.

The ALJ relied on Zimmerman's statement that Plaintiff's "attention span was adequate for all tasks." Zimmerman did not offer this treatment note to define Plaintiff's residual functional capacity, and it is not clear to which universe of tasks Zimmerman intended to refer. AR 154. In addition, Zimmerman's note is inconsistent with other evidence in the record.

The agency employee who conducted Plaintiff's initial interview observed that Plaintiff demonstrated problems with understanding, coherency, concentration, and answering, frequently turning to his sister for help. Plaintiff's mother reported that, without close supervision, Plaintiff would not finish his household chores. In Richwerger's testing, Plaintiff demonstrated concentration and attention in the tenth percentile. Richwerger opined that Plaintiff had moderate to marked impairment in his ability to perform work activities on a consistent basis, slight impairment in his ability to work without special supervision, moderate to marked impairment is his ability to complete a normal workday or work week without psychiatric interruption, and slight impairment in his ability to maintain regular attendance.

**Decompensation episodes.**  The regulation provides:

*Episodes of decompensation* are exacerbations or temporary increases in symptoms or signs accompanied by loss of adaptive functioning, as manifested by difficulties in performing activities in daily living, maintaining social relationships, or maintaining concentration, persistence or pace. Episodes of decompensation may be demonstrated by an exacerbation in symptoms or signs that would ordinarily require increased treatment or a less stressful situation (or combination of the two). Episodes of decompensation may be inferred from medical records showing significant alteration in medication; or documentation of the need for a more structured psychological support system (e.g., hospitalizations, placement in a halfway house, or a highly structured and directed household); or other relevant information in the record about the existence, severity, and duration of the episode.

The term *repeated episodes of decompensation, each of extended duration* in these listings means three episodes within one year, or an average of once every 4 months, each lasting for at least 2 weeks. ***If you have experienced more frequent episodes of shorter duration or less frequent episodes of longer duration, we must use judgment to determine if the duration and functional effects of the episodes are of equal severity and may be used to substitute for the listed finding in a determination of equivalence.***

20 C.F.R., Pt. 404, Subpt. P, App. 1, § 12.00 C.4 (*emphasis added*).

///

"'[E]pisodes of decompensation' is not a self-defining phrase." *Larson v. Astrue*, 615

F.3d, 744, 750 (7th Cir. 2010). It has been defined as the "appearance or exacerbation of a mental

disorder due to failure of defense mechanisms" *(Id.*, quoting *Stedman's Medical Dictionary* at 497

(28th ed. 2006)), and as "a temporary increase in symptoms.' *Zabala v. Astrue*, 595 F.3d 402, 405

(2d Cir. 2010); *Kohler v. Astrue*, 546 F.3d 260, 266 n. 5 (2d Cir. 2008). Evidence of episodes of

decompensation include the need for a more structured psychological support system, as by

hospitalization and placement in a halfway house; significant changes in medication; symptoms

that cause the claimant to miss work; changes in medication and fluctuating mood; side effects of

medication that affect the claimant's functioning; and symptoms that require increased treatment

or a less stressful situation. *Larson*, 615 F.3d at 750, citing *Rabbers v. Commissioner, Social

Security Administration*, 582 F.3d 647, 660 (6th Cir. 2009); *Lankford v. Sullivan*, 942 F.2d 301,

307-08 (6th Cir. 1991); *Natale v. Commissioner of Social Security*, 651 F.Supp.2d 434, 451-53

(W.D. Pa. 2009).

Before his 2005 imprisonment, Plaintiff experienced some six or seven hospitalizations

pursuant to California Institutions Code § 5150. Within the year before Plaintiff applied to

resume SSI benefits, he was hospitalized in Atascadero State Hospital for more than six months

following an expression of suicidal ideation. Throughout the period covered by his medical

records, he required changes of medication, as when the sudden development of visual

hallucinations in which he saw a man smoking a cigarette required an increase in his Risperdal

dosage. Despite medication, Plaintiff experienced chronic auditory hallucinations. The global

assessment of functioning (GAF) reported by his treating physicians varied significantly. His

father's death exacerbated his psychotic symptoms.

At the time of the hearing, Plaintiff's family have developed a system in which they

closely monitored his medication and daily activities. He was not permitted to leave home unless

accompanied by a family member. Dr. Gleason recommended a structured day program and

pondered the need for a supervised residence.

**Subsections B satisfied.** When considered as a whole, evidence within the record

supported a finding of the existence of all four of the resulting impairments listed in subsection B.

Since only two are needed, the Court concludes that Plaintiff's mental impairments met or equaled the impairments listed in 20 C.F.R., Pt. 404, Subpt. P, App. 1, § 12.03.

**E.    Hypothetical Questions to Vocational Expert**

Plaintiff also contends that the ALJ erred in composing hypothetical questions to the vocational expert.  Because this Court has determined that Plaintiff meets the requirements of a listed disability, it need not address this issue.

**III.    Conclusion and Order**

"The court shall have the power to enter, upon pleadings and transcript of record, a judgment affirming, modifying, or reversing the decision of the Secretary, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).  In social security cases, the decision to remand to the Commissioner to award benefits is within the Court's discretion. *McAllister v. Sullivan*, 888 F.2d 599, 603 (9th Cir. 1989).  "If additional proceedings can remedy defects in the original administrative proceedings, a social security case should be remanded.  Where, however, a rehearing would simply delay receipt of benefits, reversal and an award of benefits is appropriate." *Id.* (citation omitted).  If the record is fully developed and further administrative proceedings will serve no useful purpose, a reviewing court should simply reverse and award benefits. *Varney*, 859 F.2d at 1399.  The record in this case is complete, requiring no further proceedings.

Accordingly, this Court orders that the administrative determination be REVERSED and the case REMANDED for payment of benefits.  The Clerk of Court is hereby directed to ENTER JUDGMENT in favor of Plaintiff Alexander K. Louis and against Defendant Michael J. Astrue, Commissioner of Social Security.

IT IS SO ORDERED.

**Dated:    August 11, 2011**                          /s/ Sandra M. Snyder
                                                   UNITED STATES MAGISTRATE JUDGE